**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

October 25, 2013

**By ECF**

Honorable Robert P. Patterson
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street, Room 2550
New York, New York  10007

     Re:    **United States v. Anibal Soto**
              **S2 12 Cr. 556 (RPP)**

Dear Judge Patterson:

     Please accept this letter in opposition to the government's motion *in limine* to admit portions of a recorded jail call. For the reasons discussed, the Court should deny the government's motion in its entirety.

     The portions of the call the government seeks to introduce are no more than unreliable hearsay that were not clearly declarations against Ramos's penal interest. Were they admitted, this case would devolve into a trial within a trial over their various possible meanings. The Court should preclude them for that reason alone. Additionally, the Supreme Court's decision in *Williamson v. United States*, 512 U.S. 594, 599 (1994), makes clear that Rule 804(b)(3) creates only a "narrow" exception that "cover[s] only those declarations or remarks within the confession that are *individually self-inculpatory*." *Id.* (emphasis supplied). Therefore, while Ramos's statements supposedly inculpating only himself might be admissible, his statements supposedly inculpating Mr. Soto are not. Finally, Ramos's statements cannot be admitted where they would violate Mr. Soto's right to confrontation under the Sixth Amendment.

Honorable Robert P. Patterson  October 25, 2013
United States District Court  Page 2 of 9
Southern District of New York

Re:   United States v. Anibal Soto
      S2 12 Cr. 556 (RPP)

**1.   The statements the government seeks to introduce are vague, ambiguous, and unreliable.**

The hearsay statements in the call are borderline-gibberish whose meaning is difficult, if not impossible, to ascertain.[1] The government's own transcript appears to be inaccurate in places, and we respectfully urge the Court to actually listen to the call itself;[2] the conversation is largely indecipherable. For example, the government maintains that at 1:37 of the call UM2 says to UM, "You talking Annibal whipped him up?", but it is not at all clear that UM2 in fact says "Annibal," as opposed to, for example, "un amigo," or some other phrase in Spanish. *See* GX A at 2. That is in addition to the more obvious problem that the meaning of the phrase "whipped him up" is, at best, mysterious. Does "whipped him up" mean kidnapped him? Excited him? Screamed at him? Assaulted him?[3]

The portions of the phone call the government seeks to introduce are rife with ambiguous statements. Given their indeterminacy, the Court cannot conclude that these statements were even made against Ramos's penal interest in the first instance. That uncertainty renders them inadmissible. *See United States v. Wexler*, 552 F.3d 194, 202 (2d Cir. 2008) (holding that statement offered as against penal interest is admissible only where "the

---

[1] As an initial matter, the government asks us (and would ask the jury) to take its word that the parties to the call are in fact Anibal Ramos and Israel Ayala (Pookie's father). Nowhere in the call does either party refer to the other, or himself, by name, and, according to the government, the call was made using an account belonging to an inmate other than Ayala. *See* Gov't Mot. 12 n.6 (alleging, without demonstrating, that "Ayala was . . . using another inmate's phone pin"). Nevertheless, for the purposes of this response, we will assume *arguendo* that UM is in fact Ramos and UM2 is in fact Ayala.

[2] A disk containing the call will be sent to chambers as Exhibit B to this letter.

[3] The government maintains that "whipped him up" means "assaulted him," but provides no source for its definition. *See* Gov't Mot. 10. The only definition we could find online for the phrase "to whip up" is "to arouse; excite." *See* http://www.thefreedictionary.com/whip+up

Honorable Robert P. Patterson  　　　　　　　　October 25, 2013
United States District Court  　　　　　　　　　Page 3 of 9
Southern District of New York

Re:　United States v. Anibal Soto
　　　S2 12 Cr. 556 (RPP)

statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true") (quoting *United States v. Katsougrakis*, 715 F.2d 769, 775 (2d Cir. 1983)); Fed. R. Evid. 804(b)(3)(A) (permitting the admission of a statement as against the declarant's penal interest only where the statement "had so great a tendency . . . to expose the declarant to civil or criminal liability" that it is inherently reliable).

　　　The hearsay statements are particularly unreliable where the jury would not have the benefit of hearing live testimony from either party to the call who could explain the nature of the relationship between the parties and the context in which the call was made.[4] *See, e.g.*, *United States v. Barone*, 114 F.3d 1284, 1295-1300 (1st Cir. 1997) (applying "totality of the circumstances test" to supposed statement against interest that also implicates someone other than the declarant to determine if statement is sufficiently reliable to be admitted). For example, at one point Ayala says to Ramos, "What happened?" Ramos responds, "You already know my nigga." GX A at 2. But what does Ayala already know? And how does he know it? Did Ayala previously speak with Ramos about the incident? Did he speak with someone else? If so, what was he told? We'll never know. Neither will the jury.

　　　Nothing illustrates the unreliability of the hearsay statements in the call more clearly than the government's apparent misreading of its own transcript. Take the following exchange:

　　　UM:　　　Yo nigga's telling B.

　　　UM2:　　Yeah.

　　　UM:　　　Fucking snatched this nigga Annibal.

　　　UM2:　　Where?

---

[4] Nor will the Court have the opportunity to examine Ayala or Ramos outside the presence of the jury before deciding whether to admit the call.

Honorable Robert P. Patterson  October 25, 2013
United States District Court  Page 4 of 9
Southern District of New York

Re:   United States v. Anibal Soto
      S2 12 Cr. 556 (RPP)

    UM:     In his crib over there.

    UM2:    Yeah?

    UM:     Yep.

GX A at 2.

    The government, unsurprisingly, attempts to characterize this colloquy as Ramos clearly inculpating himself and Mr. Soto in the kidnapping of Alex Rosario. The government argues that Ramos's statements to Ayala are supposed to mean that he (Ramos) "snatched" Rosario and took him to Mr. Soto's "crib." *See* Gov't Mot. 10 (arguing that Ramos is admitting that he "snatched" Rosario and "placed him" in Mr. Soto's basement).

    But a more plausible reading of the exchange demonstrates that it is in no way inculpatory as to either Ramos or Mr. Soto. When Ramos says, "Fucking snatched this nigga Annibal," he is referring to the fact that the *police* had "snatched" (arrested) Mr. Soto that morning at his apartment (which is in fact what happened), *not* that Ramos had "snatched" (kidnapped) Rosario. That is why when Ayala then asks Ramos, "Where?", Ramos responds, "In his crib over there." After all, the government's theory of this case is that Ramos abducted Rosario in a different part of the Bronx, far from Mr. Soto's apartment, so it would make no sense for Ramos to say that Rosario was abducted *in* Mr. Soto's "crib." Nor would it make sense for Ramos to say "snatched this nigga Annibal" unless he is talking about the police, who, in fact, had arrested Mr. Soto that morning.[5] If Ramos is talking about having kidnapped Alex Rosario, then a statement that he (Ramos) had "snatched this nigga *Annibal*" would be nonsensical.

    Similarly, the government contorts its reading of another portion of the call where an iron is mentioned to claim that it inculpates Mr. Soto where it

---

[5] This reading is further supported by the fact that Ramos says that Annibal was "snatched" after telling Ayala that Rosario had reported the kidnapping to the police ("Yo nigga's telling B."). Ramos then illustrates his statement by telling Ayala that, as a result of Rosario's discussions with police, the police had arrested Mr. Soto.

Honorable Robert P. Patterson  October 25, 2013
United States District Court  Page 5 of 9
Southern District of New York

Re: United States v. Anibal Soto
    S2 12 Cr. 556 (RPP)

does not. The government argues that at 5:24 of the call Ramos tells Ayala that he (Ramos) and Soto hit Rosario with an iron. *Id*. But what Ramos *actually* says is "that nigga got hit with the [iron.]" GX A at 6. Ramos phrases the sentence in the passive voice, and nowhere attributes the act of "hitting" with the iron to any specific person, much less to either himself or Mr. Soto.

These examples of the government's mischaracterization of the hearsay statements in the phone call demonstrate the reason why the Court should not admit them in the first place: they are ripe for misinterpretation, and there will be no live witness to clarify their meaning. Nor is it sufficient to say that the government and the defense can simply argue their various interpretations of the hearsay statements to the jury, for the manifest unreliability of the statements renders them inadmissible as a matter of law. *See, e.g.*, *United States v. Robinson*, 554 F.2d 110, 115 (2d Cir. 1976) ("The question of trustworthiness [of hearsay evidence] is a crucial threshold issue of law going to admissibility, and it must be resolved first by the trial judge before it becomes a question of weight for the jury."); *Andrews v. United States*, 981 A.2d 571, 576 (D.C. Cir. 2009) (affirming exclusion of supposed statement against interest where the statement was susceptible of multiple interpretations and therefore "ambiguous"); *United States v. Dizelos*, 217 F.3d 841 (4th Cir. 2000) (affirming exclusion of supposed statement against penal interest where "[t]he alleged statement . . . was vague, speculative, and subject to various slants, spins, and conflicting inferences"). Accordingly, the Court should preclude the admission of Ramos's hearsay statements in the call.

**2.   Even if Ramos's statements supposedly inculpating himself are admissible, his statements supposedly inculpating Mr. Soto are not.**

The Supreme Court has made clear that Rule 804(b)(3) creates only a "narrow" exception for statements against penal interest. *Williamson v. United States*, 512 U.S. 594, 599 (1994). *Williamson* held that the exception "cover[s] only those declarations or remarks within the confession that are

Honorable Robert P. Patterson                        October 25, 2013
United States District Court                            Page 6 of 9
Southern District of New York

Re:    United States v. Anibal Soto
        S2 12 Cr. 556 (RPP)

*individually self-inculpatory.*" *Id.* (emphasis supplied). This is because while "[t]he fact that a statement is self-inculpatory does make it more reliable . . . the fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability." *Id.* at 600. This is particularly true where the collateral statement inculpates another person. *See, e.g.*, *United States v. Zapata*, 356 F. Supp. 2d 323, 326 (S.D.N.Y. 2005) ("The justification underlying the hearsay exception – that people 'tend not to make self-inculpatory statements unless they believe them to be true' – does not extend to statements concerning the roles of other individuals in the alleged crime, even when combined with self-inculpatory remarks.") (quoting *Williamson*, 512 U.S. at 599-600). Indeed, "Because of the danger of the prejudice involved, exclusion should almost always result when a statement against penal interest is offered *against* an accused." 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 804-85 (2013) (emphasis in original).

      Applying these principles, the government is arguably on stronger footing when it argues for the admission of the supposedly wholly self-inculpatory statements Ramos makes toward the beginning of the call:

      UM:        So *I* whipped him up you know what I mean?

      UM2:      *You* whipped him up?

      UM:        Yeah.[6]

GX A at 2 (emphasis supplied). But any portion where the government alleges that Ramos is inculpating Mr. Soto should be excluded under *Williamson* and its progeny.

      The government's misplaces its reliance on *United States v. Saget*, 377 F.3d 223 (2d Cir. 2004), for the proposition that even Ramos's statements that supposedly inculpate Mr. Soto are admissible. *See* Gov't Mot. 11. In *Saget*, the Second Circuit affirmed the admission of a coconspirator's

---

[6] Although it is still not clear what the phrase "I whipped him up" means.

statements to a confidential informant where, during the conversation, the coconspirator "extolled the benefits of the scheme, relaying his and Saget's gun-running practices, profits, and past exploits in a manner that implicated both himself and Saget." 377 F.3d at 225. The Second Circuit noted that the coconspirator's statements were made in response to "fairly detailed questions" from the confidential informant, and constituted comprehensive, fact-specific responses. *Id.* at 230 ("Moreover, those statements that incriminate Saget, such as the assertions that [the coconspirator] and Saget made a profit on the guns, drove them to New York, and used exotic dancers to buy guns, are factual in nature.")

In contrast, here, Ramos's statements supposedly inculpating Mr. Soto are hyper-vague and ambiguous. *See* Section 1, *supra*. They offer none of the strong indicia of reliability present in *Saget*. As we have shown, the government's effort to contort Ramos's statements to inculpate Mr. Soto are, quite simply, dubious interpretations of what Ramos appears to actually say. Accordingly, the Court should preclude the government from introducing them.

**3. Even if the hearsay statements are marginally probative, their potential for prejudice substantially outweighs their probative value.**

The hearsay statements the government seeks to introduce are wholly unreliable and therefore probative of nothing. *See* Section 1, *supra*. Even if they are marginally probative, however, the Court should exclude them under Federal Rule of Evidence 403 where they present a serious danger of confusing the issues, misleading the jury, and causing undue delay.

Should the Court admit Ramos's hearsay statements supposedly inculpating Mr. Soto, the issues of the meaning and reliability of Ramos's statements would turn into a "trial within a trial." Once Ramos's statements are introduced, the defense will be entitled to attack Ramos's credibility through a variety of methods. *See* Fed. R. Evid. 806 (permitting impeachment of a hearsay declarant's credibility through "any evidence that would be admissible for those purposes if the declarant had testified as a witness").

Honorable Robert P. Patterson  October 25, 2013
United States District Court  Page 8 of 9
Southern District of New York

Re:   United States v. Anibal Soto
      S2 12 Cr. 556 (RPP)

  For example, the defense would introduce statements made by Ramos during his guilty plea allocution where he represented that he and "another person" kidnapped Rosario and then took him to an apartment in the Bronx. *See* Transcript of Guilty Plea at 15, *United States v. Anibal Ramos*, 12 Cr. 556 (LTS), attached as Exhibit A. Of course, Ramos's sworn statement that only one other person helped him abduct Rosario directly refutes Ramos's prior claim in the jail call that multiple people, including Pookie, "were the ones that grabbed [Rosario] up." GX A at 5.

  Then, during closing statements, the defense and prosecution would likely be forced to argue at length about the myriad possible meanings of Ramos's hearsay statements in the call. Of course, those arguments would be rank speculation, since neither party to the call would have appeared in court to explain the context or the significance of what was said during the call. In short, the case would devolve into a trial within a trial on the meaning of hearsay that never should have been admitted in the first place. Accordingly, the Court should preclude Ramos's hearsay statements under Rule 403.

4. **Admitting Ramos's hearsay statements supposedly inculpating Mr. Soto would violate Mr. Soto's right to confrontation.**

  Testimonial out-of-court statements of non-testifying witnesses are inadmissible under the Sixth Amendment's Confrontation Clause where the defendant had no prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). While the government cites to a series of non-binding cases for the proposition that "a recorded jail call is simply not testimonial," it acknowledges that "the Second Circuit has not directly addressed recorded calls in jail." Gov't Mot. 14.

  Here, there are strong reasons to conclude that Ramos's statements in the jail call were testimonial. At the beginning of the call Ramos heard a message from the New York City Department of Correction ("DOC") informing him that the call "may be recorded and monitored." GX A at 1. In light of that fact, Ramos could hardly have considered the statements he made during the call the kind of "off-hand, overheard remark[s]" that are not considered testimonial. To the contrary, Ramos was aware that he was

Honorable Robert P. Patterson	October 25, 2013
United States District Court	Page 9 of 9
Southern District of New York

Re:	United States v. Anibal Soto
	S2 12 Cr. 556 (RPP)

effectively speaking to the DOC, and that he could reasonably expect his statements might be "used prosecutorially." *United States v. Feliz*, 467 F.3d 227, 233 (2d Cir. 2006) (quoting *Crawford*, 541 U.S. at 51). Accordingly, the Court should bar Ramos's statements on the ground that they constitute testimonial hearsay.

* * *

For the foregoing reasons, the Court should preclude the government from introducing Ramos's hearsay statements in the recorded jail call.

Respectfully submitted,

/s/ Jonathan Marvinny
Jonathan Marvinny
Mark B. Gombiner
Michael T. Leigh
Assistant Federal Defenders
Tel: (212) 417-8792

cc:	Hadassa Waxman, Esq. (by ECF)
	Michael D. Maimin, Esq.